INLAND TRUCKING CO. and Wesley Meilahn, co-partners, d/b/a Oshkosh Ready-Mix Co.; Cook & Brown Lime Co.; Inland Trucking Co.; and Wesley Meilahn, co-partners d/b/a Waupun Ready Mix, Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

General Teamsters Warehouse and Dairy Employees, Local Union No. 126, Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.

No. 18048.

United States Court of Appeals, Seventh Circuit.

March 29, 1971.

Russ R. Mueller, Milwaukee, Wis., for petitioners.

Alan M. Levy, Milwaukee, Wis., for intervenor; Goldberg, Previant & Uelmen, Milwaukee, Wis., of counsel.

Marcel Mallet Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., N.L.R.B., Washington, D.C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, for respondent.

Before KNOCH, Senior Circuit Judge, KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

The N.L.R.B. found that the petitioning employers committed § 8(a) (1) and § 8(a) (3) unfair labor practices by

locking out their employees, while continuing to operate by hiring temporary substitutes. Petitioners took this action upon the expiration of collective bargaining agreements, the negotiation of new agreements having allegedly reached an impasse. The record does not suggest that a strike was then imminent, although there was a strike after the lockout ended.

There appears to be no significant challenge to the facts set forth in the decision of the trial examiner, which was adopted, with minor corrections, by the board.[1] We deem it unnecessary to state the facts in detail here.

In *American Ship*,[2] the Supreme Court held "that an employer violates neither § 8(a) (1) nor § 8(a) (3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position."

Footnote 8 to the opinion of the Court said: "we intimate no view whatever as to the consequences which would follow had the employer replaced its employees with permanent replacements or even temporary help." [3]

Petitioners contend, in effect, that the question left open in *American Ship* requires an answer favorable to employers. Pointing to *Buffalo Linen*[4] and *Brown*[5] they say: "Stated another way, the Supreme Court has interpreted the Act as sanctioning the use of the lockout by employers as an economic tool to be utilized either *offensively* or *defensively* within the process and procedure of collective bargaining as well as sanctioning an employer's hiring and use of temporary employees during the defensive lockout. In view of this settled law, Petitioners are simply asking for the logi-

---

1. 179 N.L.R.B. No. 56.

2. American Ship Bldg. Co. v. National Labor Relations Board (1965), 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed. 2d 855.

3. Idem, p. 308, 85 S.Ct. p. 962.

4. NLRB v. Truckdrivers' Local 449 (1957), 353 U.S. 87, 77 S.Ct. 643, 1 L. Ed.2d 676.

5. NLRB v. Brown (1965), 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839, decided the same day as American Ship.

cal extension of this law to include the hiring and use of temporary employees during the period of an offensive lockout as a legitimate right of employers. The circumstances of this case present a rational and logical basis upon which to close the heretofore incomplete perimeter of employer's rights when they resort to the lockout device as an economic tool in the process and procedure of collective bargaining."

We think, however, that the suggested symmetry of permitting operation with replacement employees to accompany an offensive as well as a defensive lockout is deceptive.

■■ We are aware of the rule that where employees strike, an employer not otherwise guilty of an unfair labor practice may replace his employees in order to carry on his business.[6] Where there is a multi-employer bargaining group, and where there is a strike against one employer, who uses replacement labor to continue to operate, the other employers in the group may lock out and use replacement labor to continue to operate as "part and parcel of respondents' defensive measure to preserve the multiemployer group in the face of the whipsaw strike."[7]

These situations seem to us to be special ones in which the replacement measures taken by the employers were not considered by the Court in terms of an economic weapon legitimately used in the course of collective bargaining, but were deemed justified by particular circumstances as fair defensive responses to a situation precipitated by a strike. Such measures in such circumstances were deemed not to be inconsistent with employees' protected rights to bargain collectively or engage in concerted activities for the purpose of collective bargaining.

■ We note the admonition that the board does not have "general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power."[8] We recognize, surely, that this court does not have the authority so described. On the other hand, determination whether particular activity is in conflict or interferes with the employee rights protected by 29 U.S.C. § 157 will often, as we believe it does here, involve judicial interpretation of the scope and content of those rights.

■ We conclude that the bargaining lockout, which was held in *American Ship* not to be inconsistent with protected employee rights, does become so if the employer does not shut down, but continues operation with temporary replacements. Such lockout forecloses the employees' opportunity to earn without surrendering the corresponding opportunity of the employer. It would not merely pit the employer's ability to withstand a shut down of its business against the employees' ability to endure cessation of their jobs, but would permit the employer to impose on his employees obtaining for himself the returns of continued operation. Employees would be forced, at the initiative of the employer, not only to forego their job earnings, but, in addition, to watch other workers enjoy the earning opportunities over which the locked out employees were endeavoring to bargain. Permitting an employer to impose this additional price on the protected right to collective bargaining would, in our opinion, conflict with the intended scope and content of that right, as protected in 29 U.S.C. § 157.

---

6. NLRB v. Mackay Radio & T. Co. (1938), 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

7. National Labor Relations Board v. Brown (1965), 380 U.S. 278, 284, 85 S.Ct. 980, 13 L.Ed.2d 839. The relationships of the three employers who are petitioners here are described in the decision of the

trial examiner. He concluded that they "did not constitute a true multi-employer bargaining unit." In any event no strike had occurred against any employer and the record does not show that a strike was imminent.

8. *American Ship, supra,* fn. 2, 380 U.S. p. 317, 85 S.Ct. p. 986.

We conclude that a lockout in the circumstances at bar, accompanied by continued operation with replacement labor, is per se, an interference with protected employee rights, and, accordingly, per se, an unfair labor practice under § 158(a) (1).

Under § 158(a) (3) it is also an unfair labor practice to discourage membership in a union by discrimination in regard to tenure of employment. Concededly, "the use of temporary nonunion personnel in preference to the locked-out union members is discriminatory." [9] In *Brown*, where the lockout, accompanied by operation with temporary replacements, was a defensive measure to preserve the integrity of the multi-employer group against whipsaw strike tactics, the Court placed the case in "an area where the improper motivation of the employers must be established by independent evidence. When so established, antiunion motivation will convert an otherwise ordinary business act into an unfair labor practice." [10]

The Court has more recently stated a general rule, as follows:

"First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." [11]

As already indicated, we consider the petitioner's lockouts plus use of replacements to continue operations inherently destructive of protected rights. But even if the second test just quoted be applied, we do not find that petitioners have come forward with evidence of legitimate and substantial business justification for their insistence on continued operation during their offensive lockouts. The evidence as to seasonal fluctuation in their businesses explains no more than their preference for a labor confrontation in May rather than the peak summer period.

Petitioners argue, further, that if we do not decide wholly in their favor, the matter must go back to the board so that they may adduce further evidence. Their argument is difficult to follow. Counsel for petitioners offered an exhibit at the hearing. His brief says it was to be followed by other evidence for the purpose of showing how the competitive nature of the businesses and the history of negotiations were relevant to petitioners' bargaining positions. At the time of the offer, there was objection and then a colloquy concerning this area of proof and the possibility that admitting this evidence would be inconsistent with a rejection of certain proof previously offered by the union and challenged by petitioners. After the colloquy, counsel for petitioners unequivocally withdrew the offer. We perceive no sound reason for permitting petitioners to reopen this line of inquiry now.

The board's order will be enforced.

9. National Labor Relations Board v. Brown, *supra*, fn. 7, 380 U.S. p. 288, 85 S.Ct. p. 986.

10. *Brown*, p. 288, 85 S.Ct. p. 986.

11. NLRB v. Great Dane Trailers, Inc. (1967), 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027.