AMERICAN CYANAMID COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 78–1579.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1978.
Decided Feb. 2, 1979.

15 U.S.C. § 77q(a)(2).

Guy Farmer, Washington, D. C., for petitioner; Barbara J. Hillman, Chicago, Ill., for Union.

Vivian A. Miller, NLRB, Washington, D. C., for respondent.

Before CUMMINGS, LAY *, and WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

In mid-April 1975 the Union [1] commenced a lawful economic strike at American Cyanamid Company's (Company) Fortier plant in Westwego, Louisiana. The Board found that as a result of the ensuing events, the Company had violated Section 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. § 158(a)(5) and (1)) by contracting out unit maintenance and service work on a permanent basis without notifying and bargaining with the Union, thereby converting the strike to an unfair labor practice strike. The Board also found that the Company refused to reinstate striking employees upon their unconditional offer to return to work, thereby violating Section 8(a)(3) and (1) (29 U.S.C. § 158(a)(3) and (1)), and that the Company insisted that the Union sign a settlement agreement waiving statutory rights before the Company would reinstate any of the former strikers. This insistence was held to violate Section 8(a)(5), (3) and (1) (29 U.S.C. § 158(a)(5), (3) and (1)). Con-

* Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1]. Oil, Chemical and Atomic Workers International Union, AFL–CIO, Local Union No. 4–447. It represents the bargaining unit consisting of all the Company's production and maintenance employees, shipping and receiving clerks, warehouse employees, fire department employees and laboratorians in the chemical laboratories at the Company's Fortier plant. The Union filed a brief and participated in the oral argument before us as an intervenor seeking enforcement of the Board's order.

sequently, the Board required the Company to rescind its January 9, 1976, agreement permanently contracting out unit maintenance and service work at the Fortier plant, to offer reinstatement to certain employees and to make them whole for any loss of earnings. See 235 National Labor Relations Board No. 188. The Company has asked us to set aside the order of the Labor Board and it in turn has filed a cross-application for enforcement of its order. We have concluded that the Board's order should be enforced in full.

The most recent collective bargaining agreement between the Company and Union with respect to the Company's Fortier plant was effective from April 15, 1973, to April 15, 1975. The bargaining unit included approximately 460 employees. About 200 of these were maintenance and service employees and the remainder were engaged in some aspects of production (see note 1 *supra*). The parties started negotiating for a new contract on February 25, 1975, but no agreement was reached. On April 13, 1975, in accord with the contract's forty-eight hour notice requirement, the Union gave the Company notice of its intent to strike. The strike of these 460 employees began on April 17, 1975. During the lengthy strike the Company operated the Fortier plant with supervisory and other salaried personnel and employees of Payne & Keller, Inc., an independent contractor, while the parties continued to bargain. The Board found that on January 9, 1976, the Company decided to contract its maintenance and service work at the Fortier plant on a permanent basis with Payne & Keller and so advised that concern. The contract was terminable at will.[2]

At a January 22 bargaining session with the Union, the Company first informed the Union that it had decided (1) to eliminate its maintenance and service department by permanently contracting out that work and (2) to hire permanent replacements for the striking production employees as soon as possible.

At a January 28, bargaining session, the Company notified the Union that effective January 31, 1976, all functions performed by the maintenance and service departments at the Fortier plant "will be awarded to a contractor [Payne & Keller] on a permanent basis," that all hourly employees who had worked in those two departments would be permanently terminated effective January 31, and that all other striking employees would be terminated "as soon as their permanent replacements had been obtained."

The Board found that at the conclusion of the January 28 meeting, the Union told the Company that the Union was terminating the strike and making an unconditional offer to return to work. The Company's spokesman, Harold Walker, then told Union representative Palmer that Walker would let the Union know in a day or two when the employees should report for work. Both the Local and the International Union immediately confirmed by letter that the strike was terminated and made an unconditional offer, on behalf of all striking employees, to return to work.

The Union met with the striking employees, providing them with letters stating that they were unconditionally offering to return to work, and advised them to sign the letters and bring them to the plant the following morning. When 350 Union-represented employees presented themselves at the Fortier plant gate to commence work on January 29, they were told that the Company was not going to allow them to return to work until there was a signed agreement with the Union. Two days thereafter the Company notified all maintenance and service employees that their jobs had been terminated.

At another bargaining session on February 2, the Company's industrial relations director, Eugene J. Dean, Jr., said that the Company was prepared to offer the Union a Return-to-Work and Strike Settlement

---

**2.** The Administrative Law Judge found that the Company had admitted that its agreement with Payne & Keller was in fact a permanent contracting out of unit work (App. 11 n. 5). The Board adopted all her findings.

Agreement. Union representative Palmer reiterated that the strike had ended and that the employees had offered unconditionally to return to work. After a recess, the Company presented its proposed Return-to-Work and Strike Settlement Agreement. After another recess, a Union attorney told the Company that the proposed agreement was not acceptable "in its entirety" because it required a waiver of certain employee and Union rights and because it required the Union to forsake its right to strike for a year, which would impair the Union's bargaining power in obtaining a collective bargaining contract. The Union attorney again emphasized that the strike was over, that the employees had offered to return to work unconditionally, that they would work for a reasonable time without further strike action, and that the Union was amenable to giving assurances of its intention not to strike for a reasonable time.

After another recess, Dean announced for the Company that it regarded the one year no-strike period as a minimum and that because the Union had rejected the settlement agreement its unconditional offer to work was really a conditional offer. In reply, the Union's attorney said he was not converting the employees' offer to return to work into a conditional offer, that the strike was over and that the Company was entitled to an orderly resumption of production and a guarantee of a reasonable time of continued operation before any new strike would take place. The meeting ended with no agreement being reached.

On February 2, 1976, the Union filed charges that the Company had committed unfair labor practices within the meaning of the National Labor Relations Act, a complaint was issued on August 26, and the case was tried before an Administrative Law Judge (ALJ) on three days in November and one day in December 1976. Citing especially *Fibreboard Paper Products Corp.* *v. National Labor Relations Board*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 and *Westinghouse Electric Corp.*, 150 National Labor Relations Board 1574 (1965),[3] the ALJ found that by permanently contracting out the maintenance and service work at its Fortier plant on January 9, 1976, the Company violated Section 8(a)(5) and (1) of the Act and had converted the economic strike of its employees into an unfair labor practice strike. She also found that the Company violated Section 8(a)(3) and (1) of the Act by refusing the January 28, 1976, unconditional offer of the unfair labor practice strikers to return to work. Finally, she found that the Company violated Section 8(a)(5), (3) and (1) by imposing unlawful conditions upon the employees' return, "including its insistence that the Union waive bargaining rights and employees' rights to redress under the Act." Subsequently, the Labor Board adopted the ALJ's recommended order which required the Company to rescind the contract with Payne & Keller for the maintenance and service work at the Fortier plant and to restore the mode of operation existing in the bargaining unit before that work ·was permanently contracted out on January 9, 1976. The Company was also ordered to offer reinstatement to all employees engaged in the unfair labor practice strike who were not permanently replaced while they were economic strikers and to make them whole for any loss of earnings they may have suffered by the Company's failure to reinstate them upon their January 28, 1976, application.[4] Additionally the Company was ordered to bargain with the Union upon request and to embody any understanding reached in a signed agreement. The customary posting of prescribed notices was required too. In our judgment this order was permissible.

### The Company's Contracting Out Unit Work

As noted, the Labor Board found that the Company violated Section 8(a)(5)

---

**3.** In the *Westinghouse* case the Board ruled that an employer ordinarily has a statutory obligation to give a union notice and to bargain over contracting out work that results in the displacement of bargaining unit employees by a contractor's employees doing the same work.

**4.** The Company was required to preserve and make available all records necessary to substantiate the employees' claims to back pay and reinstatement.

and (1) of the Act on January 9, 1976, by unilaterally contracting out the unit maintenance and service work permanently without bargaining with the Union. Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with its employees' representatives, while Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed by Section 7 of the Act.[5] In *Fibreboard Paper Products Corp. v. National Labor Relations Board*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, the Supreme Court held that the contracting out of work previously performed by members of an existing bargaining unit is a subject about which the Act requires employers and the representatives of their employees to bargain collectively. The Court also held that the Labor Board could properly direct the employer to resume its maintenance operations, reinstate the employees with back pay, and bargain with the Union. Here the Company agreed on January 9, 1976, to contract out permanently the unit maintenance and service work without notifying and bargaining with the Union. Therefore, under *Fibreboard* the Board was empowered to issue the remedial order imposed upon the Company.

To avoid this result, the Company urges that the bargaining obligation did not exist because the decision to contract out was for legitimate business reasons. Such an argument was rejected in *Fibreboard* because national labor policy required that the existing employees be given an opportunity to negotiate a mutually acceptable alternative to the employer's contracting the work out. 379 U.S. at 214, 85 S.Ct. 398.[6] Here the Company's decision to contract out its maintenance operations permanently terminated the jobs of 200 employees, almost half the total bargaining unit represented by the Union. *Fibreboard* requires us to hold that the Company's January 9, 1976, decision to contract the work out to Payne & Keller without notice to the Union or negotiations with it contravened Section 8(a)(5) and (1).

The Company's reliance on *National Labor Relations Board v. Abbott Publishing Co.*, 331 F.2d 209 (7th Cir. 1964), and *Hawaii Meat Company v. National Labor Relations Board*, 321 F.2d 397 (9th Cir. 1963), is misplaced. The Company seeks to confine *Fibreboard* to situations in which there has been no strike. It reads *Abbott Publishing* and *Hawaii Meat*, both of which preceded the Supreme Court's *Fibreboard* decision, to authorize unilateral permanent contracting out of unit work whenever there is a strike in progress. To the contrary, those cases held only that such contracting out was authorized to enable the employer to continue operating in an emergency situation thrust upon it by a strike. Here the Union is not challenging the Company's right to continue operating by contracting out unit work on a temporary basis. It objects only to the Company's unilateral decision to make the arrangement permanent in the absence of an emergency.[7] This Company

---

**5.** Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." (29 U.S.C. § 157.)

**6.** In *Fibreboard* in the Court of Appeals for the District of Columbia, then Circuit Judge Burger's opinion held that economic necessity would not justify an employer's unilateral action in contracting out work. 116 U.S.App. D.C. 198, 322 F.2d 411, 414 (1969). This view was accepted by the Supreme Court in affirming the appellate court.

**7.** As the Company correctly points out, the situation in *Hawaii Meat* was not unlike the present one, where in the face of a strike the employer contracted out unit work on a temporary basis, and later made the arrangement permanent. Apart from the fact that the *Hawaii Meat* decision preceded the Supreme Court's *Fibreboard* explanation of the scope of the bargaining obligation in contracting out situations, it is clear that the court in *Hawaii Meat* was focusing on the original decision to contract out to meet the emergency, not on the discretionary decision to make that arrangement permanent.

did not need to effectuate permanent contracting out to remain in business because the plant had been operational since the inception of the strike through temporary arrangements with Payne & Keller, nor was that contractor requiring that relations with the Company remain permanent as a condition of continuing to work for the Company. There has been no showing that this Company would have been harmed by negotiating with the Union prior to contracting out the maintenance work permanently. Therefore no justification has been shown for the Company's failure to observe the bargaining obligations set forth in the Act. To hold otherwise would be "inconsistent with the purpose of the NLRA, which is to establish a framework of bargaining so as to allow for the peaceful resolution of industrial controversies." *Brockway Motor Trucks v. National Labor Relations Board*, 582 F.2d 720, 739 (3d Cir. 1978).

Although it denies that the *Fibreboard* doctrine applies in a strike situation, the Company also contends that if it does, the Union was in fact afforded ample opportunity to negotiate concerning the Company's decision to contract out the maintenance and service work. However, the record shows that the Company had decided to contract out this work on January 9, 1976, and yet did not disclose this to the Union until the January 22 bargaining session. At that time the Company's Industrial Rela-

tions Director Dean stated that neither he nor the management bargaining committee could rescind that decision.[8] In any event, the January 22, notice was not meaningful because it was not given sufficiently in advance of the January 9 decision to allow a reasonable scope for bargaining. *International Ladies' Garment Workers Union, AFL–CIO v. National Labor Relations Board (McLoughlin Manufacturing Corp.)*, 150 U.S.App.D.C. 71, 463 F.2d 907, 919 (1972); *National Labor Relations Board v. Central Illinois Public Service Co.*, 324 F.2d 916, 918 (7th Cir. 1963).

In sum, we conclude that the Company's unilateral action in contracting out the maintenance and service unit work on January 9, 1976, converted the economic strike into an unfair labor practice strike and that the Company violated Section 8(a)(5) and (1) by that action.

### The Company's Refusal to Reinstate the Striking Union Members

■ As seen, on January 28 the Union spokesman announced that the Union was terminating the strike and offering unconditionally to have the employees return to work. On the same day, the Local and the International Union made unconditional application for reinstatement on behalf of the employees represented by the Union. On the following day, the unit employees advised the employers in writing that they

"Our answer is 'no' to the narrow question which is presented to us, namely, whether a decision to subcontract, taken at the time an economic strike occurs, *and made for the purpose of keeping the plant operating*, constitutes a failure to bargain as required by the Act * * *.

\* \* \* \* \* \*

No case holds that a struck employer may not try *to keep his business operating;* on the contrary, it is quite clear that he has the right to do so. He may not use the strike as an excuse for committing unfair labor practices. * * *

"We think that a requirement that, upon the occurrence of a strike, *and before putting into effect a subcontracting arrangement designed to keep the struck business operating*, the employer must offer to bargain about the decision to subcontract, would effectively de-

prive the employer of this method of meeting the strike. A mere naked offer to bargain would not end the matter. The union could, by accepting the offer, deprive the employer of an effective means of meeting the strike for a period of time that might render it valueless to the struck employer." 321 F.2d at 399–400; *emphasis added.*

8. The parties dispute whether certain remarks made during the January 28 meeting "signaled" the Company's willingness to bargain on the issue. The ALJ held, after analyzing the evidence, that the Union was justified in believing that attempts to bargain would be futile. Her conclusion has ample support in the record. We therefore need not decide whether the nine days between the January 22 meeting and the implementation of the agreement on January 31 would have been sufficient time to satisfy the Company's bargaining obligation.

unconditionally offered to return to work and indeed 350 of them reported for work on January 29 when they were turned back by the Company. These factors are sufficient to support the ALJ's finding that the employees' offers to return to work were not conditional. Indeed, the Company did not even assert that the employees' offer to return to work was conditional until February 2. Consequently, the Board properly found that the Company had discouraged membership in a labor organization in violation of Section 8(a)(3) and had interfered with the employees' exercise of their Section 7 rights in violation of Section 8(a)(1).

The Company contends that the Union's offer to return to work was conditioned on the reinstatement of all strikers. It focuses first on one of the Union's bargaining demands, which was for reinstatement of all striking workers "without reprisals." This demand was originally made in August 1975 and referred to the reinstatement of certain employees who had been discharged for strike violence. The demand was reiterated in each bargaining session, including the one on January 28, 1976. However, the record shows that the last demand for reinstatement of all the employees was made during the bargaining-session phase of the January 28 meeting, and that when the Company rejected the Union's demands, the Union capitulated completely and declared the strike over. The Union's repeated insistence that it was unconditionally offering to have the employees return to work undercuts the Company's claim that prior bargaining demands made the offer conditional. See *Newspaper Production Co. v. National Labor Relations Board*, 503 F.2d 821, 829 (5th Cir. 1974).

The Union did have the right to demand reinstatement on behalf of the striking employees who had not been properly discharged, since the strike had become an unfair labor practice strike.[9] *Mastro Plastics Corp. v. National Labor Relations Board*, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309; *National Labor Relations Board v. Pecheur Lozenge Co.*, 209 F.2d 393, 404–405 (2d Cir. 1953), cert. denied, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1099. Even if it had been an economic strike, these employees—including the maintenance and service workers—would have had reinstatement rights until they were permanently replaced.[10] *National Labor Relations Board v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614; *Laidlaw Corp. v. National Labor Relations Board*, 414 F.2d 99, 103–104 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100. The Union was authorized to make the back to work offer and seek reinstatement on behalf of its striking members. *Newspaper Production Co. v. National Labor Relations Board, supra*, at 829.

The Company also asserts that the Union's actions at the February 2 meeting support its interpretation that the Union was in fact conditioning its return to work offer on reinstatement of all the strikers. It bases this conclusion on the fact that Mr. Hess, an attorney then acting as spokesman for the Union, rejected paragraph 1 of the Company's proposed agreement which required the Union to agree that employees who had been discharged, terminated or suspended would not be recalled. In fact, Mr. Hess made clear that he understood this to mean that the 200 maintenance and service employees would not be recalled and that the Union by signing the agreement would waive the right to pursue its unfair

---

**9.** If employees were discharged for strike violence or other violations of the Act while the strike was an economic one (*i. e.* prior to January 9, 1976), the Union would not be authorized to insist on their reinstatement. However, it is clear that it gave up this demand and that the return to work offer was unconditional. Whether or not there were striking employees who were properly discharged prior to January 9, 1976, is not before us.

**10.** The permanent contract with Payne & Keller was to become effective January 31, and the maintenance and service employees were discharged on that date. Thus, although the decision to contract out the work on a permanent basis had become final on January 9, the employees had not been permanently replaced when they offered to return to work on January 29.

labor practice charge on behalf of these employees. As the ALJ found, this company-drafted settlement agreement "exacted a waiver of substantial legal rights under the Act of both the employees and their representative."[11]

Finally, the Company insists that it "strains credulity beyond the breaking point" (reply br. 10) to accept that the Union's unconditional back to work offer was *bona fide.* It describes the importance of the Fortier plant (which supplies numerous other Company plants with essential materials), the expense and danger to persons and property inherent in even a partial shut-down of the plant, the length and bitterness of the strike (including some serious incidents of violence), and on the basis of these factors characterizes the back to work offer as a Trojan Horse. The Company insists that the Union wanted to resume work only so that it could coerce the Company with the threat of another expensive and dangerous strike. Although such distrust is perhaps understandable in these unfortunately bitter circumstances, there is no support for it in the record. The Union repeatedly affirmed its good faith and its recognition that the Company was entitled to an assurance of a reasonable period without a strike. The Company points to the Union's refusal to propose such a reasonable time as evidence of its bad faith, but this only demonstrates that the distrust was mutual. For the Union to offer a definite no-strike period could have made its return to work offer conditional.[12] At the February 2 meeting, Mr. Hess emphasized that the Union was willing to make a no-strike commitment. While he did not make a

definite proposal when the Company asked him to put one in writing, neither did the Company propose anything less than the one year previously suggested. After reviewing the charges and counter-charges based on this interchange, the ALJ concluded, "In my view, Respondent [Company] was attempting to bait the Union into making a statement it could interpret as placing a condition upon the return to work offer." While we do not necessarily embrace that conclusion, we do agree that the Company has not substantiated its charge of bad faith.

### The Company's Insistence Upon a Settlement Agreement

■ When the employees reiterated their unconditional request to return to work on February 2, the Company insisted upon the Union's signing a settlement agreement.[13] This agreement would require the Union to acquiesce in the exclusion for reinstatement of all terminated employees and to give up any right to seek redress for such terminations.[14] Also, the employees would be required to sign a health statement and submit to a physical examination risking possible disqualifications. Only the vacation, holiday and wage provisions of the prior collective bargaining agreement were to be honored by the Company until a new agreement was negotiated, and the old agreement was to be declared null and void. Apparently the Union was being required to waive for one year the right to change any matter covered by the settlement agreement. In view of the employees' unconditional offer to return to work, the

---

11. Four "illegal" conditions in the agreement were spelled out by the ALJ (p. 20 of Decision; App. 24).

12. In *Indiana Ready Mix Corp.,* 141 National Labor Relations Board 651 (1963), the Labor Board had held the union's offer to come back to work for thirty days without a strike to be a conditional back to work offer. Therefore for the Union in the present case to counter the Company's offer with a definite period of time could have been construed as making its return to work offer conditional.

13. The Company says that it did not "insist" but the ALJ found that it did. Her findings are supported in the record and we will not disturb them.

14. The Company now says that it did not intend this provision to waive the Union's right to pursue before the Labor Board its argument that the decision to contract out permanently was an unfair labor practice. However, as noted, for the Union Mr. Hess expressed his understanding that such a waiver was required, and the Company did not seek to clarify the point then as it does now.

Company could not impose those conditions on the reinstatement of the strikers.

While acknowledging that the situation of strikers seeking a return to work is different from one involving an employer-initiated lockout, the Company nevertheless seeks support by drawing analogies from such lockout cases. Since it could have locked out the employees altogether, the Company reasons *a fortiori* it can impose reasonable conditions on ending the lockout. Although this claim has some appeal, it is novel and presents numerous difficult issues.[15] We need not decide under what circumstances an employer might be able to convert an economic strike to a permissible lockout or what conditions, if any, short of reaching agreement on the economic issues it might attach to ending such a lockout. Here we are faced with an unfair labor practice strike, which entitled the employees to reinstatement upon their unconditional back to work offer.

In addition, the conditions the Company sought to impose in exchange for ending the lockout were far from reasonable. The Company's lockout was to compel acceptance of a proposed strike settlement agreement which would condone its unfair labor practice and exact a waiver of statutory rights and redress. Therefore the Company's lockout of January 29 was unlawful and interfered with protected employee rights, all in violation of Section 8(a)(5), (3) and (1). *National Labor Relations Board v. Bagel Bakers Council*, 434 F.2d 884, 888–889 (2d Cir. 1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648; *Inland Trucking Co. v. National Labor Relations Board*, 440 F.2d 562, 565 (7th Cir. 1971), cert. denied, 404 U.S. 858, 92 S.Ct. 106, 30 L.Ed.2d 100.

The Company's petition for review is denied. The Labor Board's order of May 2, 1978, will be enforced in full.

---

**15.** It is not clear that a lockout would have been lawful in this situation. The Supreme Court has authorized offensive lockouts to bring economic pressure to bear on a union in a bargaining situation (*American Ship Building Co. v. National Labor Relations Board*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855), and has held defensive lockouts in which the employer continues to operate with temporary labor to be lawful (*National Labor Relations Board v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839). This Court has held that an offensive, economically motivated lockout coupled with continued operation through the use of tempo-rary labor is an unfair labor practice, at least where the employer does not show a substantial business justification for its continued operations. *Inland Trucking Co. v. National Labor Relations Board*, 440 F.2d 562, 565 (7th Cir. 1971), cert. denied, 404 U.S. 858, 92 S.Ct. 106, 30 L.Ed.2d 100. The fact that the Labor Board disavowed *Inland Trucking* in *Ottawa Silica Co.*, 197 National Labor Relations Board 449 (1972), is not dispositive, and whether the Company could present a justification which would avoid the *Inland Trucking* rule is unclear.