**LAND AIR DELIVERY, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 87–1758.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1988.

Decided Dec. 2, 1988.

David Leightty, with whom Louis J. Amato, Louisville, Ky., was on the brief, for petitioner.

Joseph A. Oertel, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., were on the brief for respondent.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and MILTON POLLACK,* Senior District Judge, United States District Court for the Southern District of New York.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This is a petition for review of a decision by the National Labor Relations Board. The Board affirmed a finding by an administrative law judge that Land Air Delivery, Inc. violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) & 158(a)(1) (1982), by permanently contracting out bargaining unit work during the course of a strike without notifying and bargaining with the Teamsters Local. The Board also found that Land Air violated sections 8(a)(3) and 8(a)(1) of the Act, 29 U.S.C. §§ 158(a)(3) & 158(a)(1), by refusing to reinstate strikers, who made an unconditional offer to return to work, in place of new independent contractors. We conclude that the Board's decision was supported by substantial evidence in the record as a whole, and therefore we deny the petition for review.

I.

Land Air Delivery, Inc. is an air freight motor carrier that engages in the pickup and delivery of small packages for overnight carriers. In 1973, the Board certified Teamsters Local 41 as the exclusive bargaining agent of "[a]ll truck drivers and warehousemen" employed by Land Air. In 1975, the Board clarified the bargaining unit by excluding independent contractors who transported freight for Land Air. At

the time of the strike that led to this litigation, Land Air employed 13 bargaining unit truckdrivers and used an additional group of independent contractor drivers.

The unit employees were covered by the Teamsters' National Master Freight Agreement ("NMFA"), which was effective from March 1, 1982 to March 31, 1985. The extent of Land Air's use of independent contractors was a major issue in the 1982 negotiations for a new contract. Petitioner presented at least three subcontracting proposals to the union during their negotiations, and the union rejected each one. The union insisted upon the more restrictive subcontracting language provided in Article 32 of the NMFA, which prohibited the subcontracting of work that employees in the bargaining unit performed. The parties eventually reached a bargaining impasse in late 1982 over the subcontracting language (and over an acceptable grievance machinery), and the union struck to enforce its demands. After three days, Land Air agreed to the subcontracting language in the NMFA.

In November 1984, the union notified the company that the union had authorized a strike, pursuant to the terms of the NMFA, to protest both the company's failure to comply with certain grievance awards and its refusal to take a deadlocked grievance to the next step of the grievance procedure. All 13 unit employees struck, and Land Air immediately hired replacement workers. To continue its business during the strike in Kansas City, Land Air used a mix of employees from other locations, its contractors and contractor drivers, newly-hired employees, and its own staff and supervisors. The company hired eight new employees in November and December 1984; three of these employees were terminated in December 1984, and five were terminated on March 28, 1985. Thus, as of March 28, 1985, Land Air had terminated all of its replacement employees.

The company also signed agreements with 12 independent contractors between February 20 and March 1, 1985. Five of these persons had not been contractors be-

fore the strike, and all 12 contractors continued to work for Land Air after the end of the strike. Although the exact timing is not clear from the record, the combination of subcontracting on February 20 and March 1 and termination of replacement employees on March 28 resulted in the elimination of all bargaining unit positions by March 1985.

The strike lasted almost five months, until April 1985, and it resulted in violent action by the strikers against replacement workers and company property. During the course of the strike, Land Air filed an unfair labor practice charge against the union stemming from these acts of violence and coercion. On February 4, 1985, the union entered into an informal settlement agreement, which contained a nonadmission clause, and it also issued a Notice to Employees and Members that it would not engage in coercive acts.

The strike ended on April 9, 1985, when the union members offered orally to return to work unconditionally. At that time, the general manager of Land Air informed the former strikers that there was no work for them. On April 11, the union's business agent communicated the same unconditional offer to Land Air by mail. Land Air took no action to reinstate the striking employees, and the union filed a charge against the company alleging that it had committed an unfair labor practice by refusing to reinstate the strikers. The Board's regional director dismissed the charge, finding that "the subject strike was an economic strike giving the employees the right to reinstatement only at such time when positions become available." Because Land Air had not hired any new employees since the unconditional offer of April 9, the regional director concluded that the company's refusal to reinstate the strikers was not a violation of the Act.

After the regional director issued his ruling, the union made several requests for employment information from Land Air. On June 3, the union asked whether the company had hired any new employees

since April 1, 1985 or whether any of the work previously performed by the bargaining unit employees was subcontracted as of June 3. Land Air, erroneously stating that the inquiry involved matters relating to a pending case before the Board,[1] declined to comment on the inquiry. On June 22, the union went back on strike. On July 16, the union's attorney again requested information from the company, this time asking for "the employment status of each and every member with Land Air Delivery, Inc." Land Air responded that it would reply to the request by August 2, but it failed to do so. On August 16, the union's attorney again requested employment information from the company and, for the first time, accused Land Air of subcontracting bargaining unit work without first bargaining with the union.

On August 22, 1985, Land Air's attorney responded to the union's queries. His letter stated that with regard to "putting a label" on the employment status of the persons working for the company, "your guess is as good as mine." He went on to say that during the strike, the company "hired some additional employees as replacements and continued to conduct business as it formerly did prior to the strike." On October 9, 1985, after some further communication with the company, the union filed a charge with the Board asserting that Land Air had violated sections 8(a)(1) and (3) of the Act by, *inter alia*, "continu[ing] to allow independent contractors or sub-Independent contractors to continue to perform work of the bargaining unit once there was an unconditional offer to return to work." On February 20, 1986, the union filed an amended charge alleging violations of sections 8(a)(1), (3), and (5), and specifying:

On or about February 1, 1985, [Land Air] by its officers, agents and representatives subcontracted out bargaining unit work without notice to or bargaining with the Union.

On or about April 9, 1985, [Land Air] by its officers, agents and representatives

1. The relevant unfair labor practice charge was dismissed on May 21, 1985, and the period allowed for filing an appeal had expired by the date of Land Air's response.

failed and refused to reinstate striking employees who had made an unconditional offer to return to work.

The administrative law judge found that Land Air had violated sections 8(a)(1), (3), and (5) of the Act by permanently subcontracting unit work without prior bargaining. He determined that by March 1985, petitioner had contracted out all bargaining unit positions. He ordered the company to reinstate nine strikers and directed that they receive backpay from Land Air (four of the striking employees were not ordered reinstated because of specific instances of employee misconduct). The ALJ rejected the company's claim that the union's charges were barred by the statute of limitations in section 10(b) of the Act, 29 U.S.C. § 160(b) (1982). The Board affirmed the ALJ's findings on these issues, and Land Air petitions this court for review.

## II.

■ Petitioner contends that as a matter of law an employer is entiled to replace economic strikers permanently with subcontractors *at any time* during the strike without bargaining with the union over that decision.[2] The Board, on the other hand, appears to maintain that an employer is *never* (even during an economic strike) permitted to subcontract permanently, without bargaining over the decision.[3] We reject petitioner's contention, and do not find it necessary, in order to resolve this case, to pass on the Board's proposition. Even if pressing "business necessity" would justify permanently contracting out unit work, Land Air has not shown such necessity here.

Long settled is the rule that an employer —at least absent an economic strike—is obliged to bargain with his union before he decides to subcontract. The basis for this requirement is that subcontracting erodes the bargaining unit and is an "appropriate" subject for collective bargaining. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Also long settled, however, is the principle that an employer faced with an economic strike is entitled to replace strikers permanently with new employees. *NLRB v. Mackay Radio*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Land Air claims that *Mackay Radio* in effect "trumps" *Fibreboard*, because there is no meaningful distinction between replacing strikers with permanent employees and replacing them with permanent subcontractors. We see at least a theoretical distinction, however, and that difference probably has practical consequences.

■ A permanent subcontract diminishes the bargaining unit by the scope of the subcontract. *See International Union, UAW v. NLRB*, 381 F.2d 265, 266 (D.C.Cir.), *cert. denied*, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967). Contracting out all bargaining unit work, as occurred in this case, completely destroys the bargaining unit. Although as a practical matter it may be true that total replacement of strikers by new permanent employees will often result in a decertification of the union, there is a legal difference between the employer unilaterally dissolving the unit by contracting out its work and the employees in the unit themselves decertifying the union. Until decertification, the employer is obliged to bargain with the striking union over all terms and conditions of employment in the bargaining unit, and his obligation would be lessened if a por-

---

**2.** Although neither petitioner nor the Board in their briefs is entirely clear as to what is meant by *permanent* subcontracting, we take the term to mean subcontracting for an indefinite future period *not to terminate at the expiration of the* strike.

**3.** The Board urged that an employer has two options when faced with an economic strike: (1) it can hire permanent employee replacements or (2) it can contract out the work on a temporary basis. *But cf. Elliott River Tours,*

*Inc.,* 246 N.L.R.B. 935 (1979) (Board countenanced contracting out for two years, which exceeded the duration of the strike, because subcontractor demanded long term as condition for taking on the work). In view of *Elliott River Tours,* we do not take the Board's current position to preclude argument that at least long-term subcontracting is available in special circumstances, *i.e.,* when permanent replacements or temporary subcontractors are not viable options.

tion of the work of the unit were permanently subcontracted. Bringing on permanent replacements, moreover, does not necessarily lead to the extinction of the bargaining unit. A striking union might be able to gain the allegiance of at least some of the replacement employees who, combined with strikers, could provide the union with continued majority support. We think, therefore, that the Board is within its authority to treat permanent subcontracting during a strike differently from the use of permanent employee replacements for purposes of section 8(a)(5) of the Act.[4]

Despite our conclusion that permanent subcontracting is not legally equivalent to the use of permanent replacements, we still must confront the question whether permanent subcontracting violated the NLRA under the circumstances of this case. Petitioner relies for support primarily on the decision of the Ninth Circuit in *Hawaii Meat Company v. NLRB*, 321 F.2d 397 (9th Cir.1963), where the court held that an employer's unilateral decision to subcontract work permanently during an economic strike did not violate section 8(a)(5). *But cf. American Cyanamid v. NLRB*, 592 F.2d 356, 360 n. 7 (7th Cir.1978) (reading *Hawaii Meat* as compatible with distinction between generally permissible temporary subcontracting in face of strike and generally impermissible permanent subcontracting); *see also Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1088–89 (1st Cir. 1981); *NLRB v. King Radio Corp.*, 416 F.2d 569, 572 (10th Cir.1969) (distinguishing

between permanent and temporary subcontracting). Judge Duniway's opinion in *Hawaii Meat*, however, was carefully drawn to deal with the exigencies of the particular situation presented, and to exclude from the decision's compass cases like the instant one. In *Hawaii Meat*, the employer determined before the strike to subcontract permanently its hauling operations in the event of a strike, and it notified the union of its plans just before the strike. It was undisputed that the employer's purpose in subcontracting was totally defensive—to keep its plant operating during the strike. *Id.* at 399. The court rejected the Board's finding of a violation of section 8(a)(5), because to require an employer to bargain to impasse over a subcontracting decision under those exigent circumstances would be to give the union a practical veto over the decision. As the court observed, the union could easily delay an impasse and thereby prevent the employer from continuing business during the strike. *See id.* at 400. We read *Hawaii Meat*, then, to stand for no more than the proposition that an employer may not be obliged to bargain with a union about permanent subcontracting during a strike when that subcontracting is necessary to the business purpose of keeping the plant continuously in operation and time of decision is of the essence.[5]

Although the Board has permitted unilateral subcontracting that extends beyond the end of a strike in a case where the subcontractor insisted on such an arrangement, *see Elliott River Tours*, 246 N.L.R. B. 935 (1979) (two year subcontract), it does

---

4. Petitioner claims that his decision to subcontract did not foreclose reemployment of strikers, because it planned to offer strikers the right to reinstatement if the subcontractors ceased operations. This argument, as far as we can determine, was not preserved in Land Air's exceptions to the ALJ's decision or presented to the Board, so it is not properly before us. We note, however, that unless petitioner was asserting that the subcontracting was really temporary, *cf. Elliott River Tours, Inc., supra* note 3, the argument misses the point, for whether or not petitioner was prepared to reemploy strikers if the subcontractors terminated their relationship, the bargaining unit was truncated in the meantime.

5. The Board's brief dismisses *Hawaii Meat* altogether, because it was decided prior to the Supreme Court's decision in *Fibreboard*. That position seems quite disingenuous to us, because the court in *Hawaii Meat* assumed the result in *Fibreboard*, as it had been decided by the Board and by this court. *See Hawaii Meat*, 321 F.2d at 399. Indeed, Judge Duniway's reasoning, suggesting that it is anomalous to require an employer to bargain with the union about measures the employer needs and will use to blunt a strike before they are employed, does not appear inconsistent with Chief Justice Warren's opinion in *Fibreboard*, which focused on the "appropriateness" of bargaining over the subcontracting decision. *Fibreboard*, 379 U.S. at 214, 85 S.Ct. at 405.

not appear to have accepted even our narrow reading of *Hawaii Meat* that permanent subcontracting may be undertaken without first bargaining when needed to continue operations. *See supra* note 3. It is unnecessary for us to pass on the Board's reluctance to endorse *Hawaii Meat*, however, because it is clear to us that the ALJ was amply supported in his finding that petitioner's decision was not motivated by business necessity.[6]

The subcontracting at issue in this case took place more than three months after the strike started, and Land Air had successfully operated during that entire period with a mixture of employees from other locations, pre-strike contractors, new employees, and office staff and supervisors. Although the employer pointed to violence by union members and large security expenses as the business reason for the decision, the subcontracting did not take place until after the union had settled the employer's unfair labor practice charge stemming from the violence. Thus, since the ALJ found no evidence of violence after the entry of the settlement agreement, it was reasonable for him to conclude that the contracting out was not an effort to avoid violence. (If the ALJ's determination were unsupported, we would have quite a different case.) And, despite petitioner's contention that the employees themselves asked to be converted to subcontractors, the ALJ found that the employees had not demanded subcontractor status as a condition for

their continued service. In fact, Land Air's president testified before the ALJ that the reason for the shift to independent contractors was "something that had happened somewhere as far as court cases were concerned...."

In the context of the past years of dispute between petitioner and the union over the degree of subcontracting, Land Air's decision to subcontract all of its driving work during the union's ineffective strike hardly looks motivated by business necessity. Rather, it appears that petitioner seized the opportunity it thought legally available to fashion a final solution to the dispute over the use of independent contractors. There is no reason to believe that negotiation with the union over that issue was any more inappropriate or anomalous in March 1985 than it had been in previous years. *See American Cyanamid Co. v. NLRB*, 592 F.2d 356, 361 (7th Cir.1979) ("There has been no showing that this company would have been harmed by negotiating with the union [during a strike] prior to contracting out the maintenance work permanently."). The union could not have at that point, as it could have in *Hawaii Meat*, used manipulative bargaining to stymie Land Air's efforts to maintain operations.[7]

■ So, we see no need to consider what circumstances would justify an employer's unilateral decision permanently to subcontract bargaining unit work to withstand a strike. Whatever those circumstances ar-

---

6. In its line of cases concerning temporary subcontracting during an economic strike, the Board uses the phrase "business necessity" to refer to decisions motivated by the desire to maintain business operations during the course of a strike. *See Elliott River Tours*, 246 N.L.R.B. at 935; *Empire Terminal*, 151 N.L.R.B. 1359, 1364–65 (1965), *aff'd sub nom. Dallas General Drivers, Local No. 745 v. NLRB*, 355 F.2d 842 (D.C.Cir.1966); *Shell Oil Co.*, 149 N.L.R.B. 283, 285 (1964). It is not clear from the Board's decisions where the burden of proof lies on that issue, nor has the Board enunciated a standard of proof. As far as we can tell, for example, it has never held that an employer must meet the burden of demonstrating that defensive measures taken were its only option or that they were the option that would have the least adverse effect on the bargaining unit.

7. The Seventh Circuit in *American Cyanamid* seems to suggest that an initial decision to subcontract in the face of a strike is by definition always temporary and becomes permanent only at the employer's discretion (perhaps only when he refuses to reinstate strikers). 592 F.2d at 360. But that view ignores the prospect that an employer may not be able easily to obtain subcontracting on a temporary basis. In that regard, the *American Cyanamid* court may not have fully comprehended the Ninth Circuit's *Hawaii Meat* opinion; the court there held that the employer did not have to bargain *before* making its decision to subcontract permanently, but might have to bargain *after* the decision if the union asked to bargain about whether to keep the subcontracting arrangement in effect once the strike ended. *Compare American Cyanamid*, 592 F.2d at 360 n. 7 *with Hawaii Meat*, 321 F.2d at 399.

guably might be, they do not exist in this case. Land Air was able to operate at the onset of the strike without permanently contracting out unit work, and there is no evidence that it was unable to continuing doing so.[8]

### III.

Land Air's final contention is that the union's claim is barred by the statute of limitations in section 10(b) of the Act, which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board...." 29 U.S.C. § 160(b) (1982). The union's unconditional offer to return to work came on April 9, 1985; the union filed its original charge, alleging a violation of sections 8(a)(3) and (1) on October 9, 1985, and it filed an amended charge, which specifically alleged a violation of section 8(a)(5), on February 20, 1986.

 We agree with the Board that although the alleged violation of section 8(a)(5) took place more than six months before the filing of the amended complaint on February 20, 1986, the union did not have notice of the permanent subcontracting of unit work until a date within the six month period preceding February 20. The limitations period does not begin to run until the party filing the charge knows or has reason to know that an unfair labor practice has occurred. *See, e.g., NLRB v. International Brotherhood of Electrical Workers*, 827 F.2d 530, 533 (9th Cir.1987); *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 614 (1st Cir.1987); *cf. ILGWU v. NLRB*, 463 F.2d 907, 922 (D.C.Cir. 1972) (where union's "failure to file a charge within six months ... [is] due to the company's fraudulent concealment of its plans rather than the union's lack of diligence," time bar is tolled). Although the union did accuse the employer on August 16, 1986 of unilaterally subcontracting unit work, Land Air's return letter of August

22, which stated that the company had "continued to conduct business as it formerly did prior to the strike," could reasonably have been construed as a denial.

 Alternatively, we agree with the Board that the original charge, which was filed within six months of the unconditional offer to return to work, was sufficient to support the General Counsel's section 8(a)(5) complaint. It alleged, *inter alia*, that Land Air had "continued to allow independent contractors or sub-Independent contractors to continue to perform work of the bargaining unit once there was an unconditional offer to return to work." The Supreme Court has instructed that in framing its complaint, the Board is not limited to specific matters alleged in the charge, *NLRB v. Fant Milling Co.*, 360 U.S. 301, 307–08, 79 S.Ct. 1179, 1183–84, 3 L.Ed.2d 1243 (1959), and we have recently held that "when the Board ventures outside the strict confines of the charge, it must limit itself to matters sharing a significant factual affiliation with the activity alleged in the charge." *G.W. Galloway Co. v. NLRB*, 856 F.2d 275, 280 (D.C.Cir.1988). Because the factual activity alleged in the union's charge in this case was the *precise activity* that supported the Board's allegations under section 8(a)(5), it seems clear that the Board did limit itself to matters "sharing a significant factual affiliation" with the activity alleged in the original charge.

\* \* \*

For the foregoing reasons, the petition for review is

DENIED.

---

**8.** Because the company's unilateral decision to use contractors was illegal under section 8(a)(5), it follows that the use of contractors cannot justify the company's refusal to reinstate the employees. Thus, the Board also was correct to find a violation of section 8(a)(3).