**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ROBERT S. ABBOTT PUBLISHING COMPANY, an Illinois corporation, Respondent.**

**No. 14248.**

United States Court of Appeals Seventh Circuit.

April 14, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Ira M. Lechner, Attys., N. L. R. B., Washington, D. C., for petitioner.

Joseph Z. Willner, George N. Leighton, Chicago, Ill., McCoy, Ming & Leighton, Chicago, Ill., of counsel, for respondent.

Before DUFFY and SCHNACKEN-BERG, Circuit Judges, and MERCER, District Judge.

SCHNACKENBERG, Circuit Judge.

National Labor Relations Board, by its petition pursuant to § 10(e) of the National Labor Relations Act, as amended,[1] has asked us to enforce its order issued November 27, 1962 against Robert S. Abbott Publishing Company, an Illinois corporation, respondent.[2]

Respondent is engaged in Chicago in newspaper publication and printing. The Board found that respondent violated § 8(a) (1) and (5) of the Act, by failing to bargain in good faith with the Union. This ultimate finding was based on subsidiary findings that respondent: (1) did not make a good faith effort to substantiate its claimed inability to

---

1. 29 U.S.C.A. § 151 et seq.

2. The decision and order appear at 139 N.L.R.B. 1328.

grant a wage increase to all the employees in the nonmechanical units, (2) engaged in dilatory tactics in failing to schedule bargaining meetings with respect to the mechanical unit, and (3) contracted out the work performed by the mechanical unit without bargaining with the Union about this decision. There was a finding that respondent also violated § 8(a) (1) and (3) by refusing to reinstate unfair labor practice strikers upon their unconditional application for reinstatement. The evidence upon which the Board based these findings is summarized below.

### As to the Nonmechanical Unit.

Until November 1, 1960, respondent and Chicago Newspaper Guild, Local 71, AFL-CIO, herein called the Union, were parties to collective bargaining agreements which covered respondent's employees in the nonmechanical unit. On September 21, 1960 the Union submitted proposals for a new contract to replace one which was to expire on November 1. Until February 27, 1961, there were "approximately five or six" negotiating meetings, during which respondent submitted a job reclassification proposal for about 20 of the 45 unit employees. This was not intended by it as a general offer to increase pay. However, respondent thereafter withdrew this proposal, for the reason that its auditor had said that the offer should not have been made because "there just was not any money available to give increase."

By the time the collective bargaining sessions began for the new contract for the nonmechanical employees respondent had experienced financial difficulties characterized by serious shortcomings in its bookkeeping department. It so informed the Union.

At a meeting on December 21, 1960, Kenneth Byrd, who, according to the report of the trial examiner, was executive director of the Union and its chief spokesman at most of the bargaining sessions, and Eleanor Pino, a member of the bargaining committee, conferred with respondent's president, its personnel director Pratt and James Parsons, its attorney (since inducted as a judge of the United States District Court for the Northern District of Illinois). It became clear that the chief issue was a demand for a salary increase "across the table".

After the collective bargaining sessions began to the date until they were ended by the filing of the Union's first charges on April 25, 1961, approximately 14 meetings were held.

Respondent's representatives repeatedly informed the Union that it was unable to grant a wage increase. The Union representatives demanded that respondent prove its inability. In attempting to meet these Union demands, respondent's president on March 17, 1961 offered to produce the weekly profit and loss statements, informed the Union representatives of the difficulty in obtaining information from its auditors because the bookkeeping department was in the process of being revised, and offered to release from their confidential obligation to respondent Union members who worked in the bookkeeping department, so that they could reveal to the Union officials the financial condition of respondent. These offers were refused by Byrd. The rejection was based on the ground that these workers in the bookkeeping department were merely "bookkeepers * * * not qualified people to determine" respondent's alleged inability to pay wage increases.

Byrd said that the new contract must contain some increase in wages but that the Union would be willing to extend the existing contract if respondent would "prove to us some way that you don't have the money". Respondent's president replied that it was in dire financial condition and was currently in the process of conducting executive meetings to determine methods of meeting "this emergency situation". He anticipated that it would be necessary to make a reduction in force on or about April 1 and that he was having difficulty in obtaining information from his auditors as to respondent's financial condition, because of the reorganization of the entire bookkeeping department.

In response to Byrd's request, the president refused to release the books for inspection, on the ground that he did not want the books "made public, because it is a bad thing if the public knows that a company is not in good financial condition". He referred to Byrd's request as a "fishing expedition" into the books.

Further, on April 19, 1961, respondent's president offered to furnish the Union a profit and loss statement for the period ending June 1960 (which was subsequently received by him from respondent's Detroit accountants with covering letter dated April 22, 1961).

General counsel for the Board asserts *now* in his brief that the president did not inform the negotiators that he had an interim audit report furnished him on September 15, 1960, which contained a comparative statement for profit and loss for 6 months periods ending June 30, 1959 and June 30, 1960. However, we find from the record that the fact is otherwise. It was not until April 22, 1961, that auditor Richard H. Austin transmitted this audit to the president.

### As to the Mechanical Unit.

For at least ten years prior to February 15, 1961, the mechanical unit of respondent was represented by an independent union. While bargaining sessions were in progress, respondent and the Union entered into a stipulation, by which a consent election was held to determine the bargaining representative for the mechanical unit. Such election was held and on February 23, 1961, a certificate was issued by the Regional Director designating the Union as the mechanical unit's bargaining representative.

Negotiations between respondent and the Union in regard to the mechanical unit failed to proceed to a consummation.

Following a union meeting attended by members of both the mechanical and nonmechanical units on April 8, 1961, a report was made to the employees in regard to the failure to agree on a wage increase and the alleged lack of an offer by respondent of proof to substantiate its financial distress. The employees voted to strike. This information was conveyed to respondent's president on April 13 and again a request for proof of financial inability to grant a wage increase was made. When asked if respondent and the Union could agree to an impartial certified public accountant or someone else to examine the books, dividing the cost, the president said he could not pay for another audit.

On April 16, 1961 both the nonmechanical and mechanical unit employees went on strike and respondent contracted out the work formerly performed by the employees in the mechanical unit.

On April 24, respondent provided the Union with the comparative statement of income for six months ending June 30, 1959 and June 30, 1960, as above mentioned.

Respondent's attorney told the Union that there would be some people whom "we won't be able to take back". When asked to identify these people, the attorney named all of the employees who were on strike. He announced that some of them had been replaced, while the jobs of others had been eliminated. On behalf of the employees the Union then made an "unconditional" offer to return to work. Respondent replied that it anticipated a few openings in the near future. At no time in the negotiations had the Union been advised or consulted as to respondent's intentions as to the contracting out of some of its work.

On three occasions between April 28th and August 1, 1961, respondent offered to re-employ some of the former strikers, none of whom accepted the employment.

The Board's order requires respondent to cease and desist from the unfair labor practices found, and to abrogate its contracting out arrangement, to bargain with the Union on request, to offer reinstatement to the strikers with backpay from the date of respondent's refusal to reinstate them to the date reinstatement is offered them, and to post appropriate notices.

■ 1. We find undisputed evidence that respondent in more than one way offered to the union representatives access to the same means which it had of ascertaining whether it had financial ability to grant the wage increases demanded by the unions. (1) Thus, on March 17, 1961, its president offered its weekly statements of profit and loss, which was "all that I had," and told Byrd he would "be glad to go over it with him". This offer was refused by Byrd on the strange ground that "the people might think I am selling them out". (2) Again, respondent offered to release from their confidential responsibility to respondent those union members who worked in the bookkeeping department, so that they might reveal to union officials respondent's financial condition. This offer was refused by Byrd, who gave as a reason that these workers were mere bookkeepers. This reason seems to lack validity, in view of the fact that the union on April 13, 1961, spoke of its auditors and also offered to pay half the cost of an audit by an impartial CPA. It follows that the union's auditors, based on information procured at their direction from respondent's books by union member bookkeepers, could have verified or disputed the employer's contention that it was financially unable to grant the rate increases demanded of it.

While we do not pass on the credibility of the witnesses nor the weight to be given to the evidence, we are required to ascertain whether the order of the Board may be permitted to stand in view of the uncontradicted evidence to which we have referred. That evidence established that respondent in good faith made available to the chief union negotiator and to the union by every reasonable means at its command all pertinent information which it had as it got it. We know of no greater requirement announced by the United States Supreme Court. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 and N. L. R. B. v. United Brass Works, Inc., 4 Cir., 287 F.2d 689, 691.

Specious reasons were assigned by the union representatives for summary rejection of these offers, raising some doubt as to the sincerity of the demands themselves. Chief negotiator Byrd, rather than look at tendered material, accompanied by an explanation thereof by respondent's president, was willing to risk his own reputation as an honorable man by suggesting that the people whom he represented might think that, if he looked and listened, he was "selling them out". Or did he believe that "his people" did not want the facts as to the employer's financial ability as much as a chance to embroil the president in a lively personal confrontation before all of the members of the bargaining committee? To the union, which was itself financially able to hire a certified public accountant and to pay half the cost of an audit of respondent's financial affairs, respondent offered to permit union members, who were employed in the bookkeeping department of respondent, to divulge any facts or figures on the employer's records. The union's refusal to accept this proposition defies any justification, except on the ground that it simply did not want to know the facts. The goal in sight may have been a strike. This we need not decide.

The union's rejections of these avenues for investigation of the employer's financial situation raise the question of whether the demands by the union were for information or to publicize, embarrass or humiliate the employer, to the jeopardy of its credit standing and public prestige. It is in this connection that we cite Board counsel's assertion in his brief that, when the weekly statements were tendered to the union representatives, the employer "had in its possession the auditor's comparative statement of income", which, as we have pointed out, *ante* 3, is not true.

We are not here considering a recalcitrant employer. From the evidence, considered as a whole, it is clear that respondent did not fail to bargain with the union in violation of § 8(a) (1) and (5)

of the Act. The strike that followed was not an unfair labor practice strike.

■ 2. Inasmuch as the Board found (erroneously, we believe) that respondent's conduct in failing to schedule dates to begin negotiations for the mechanical unit contract was dilatory, and approved a finding that "when considered together with its action in the nonmechanical negotiations, shows that it was not bargaining in good faith", our adverse holding as to respondent's good faith in the nonmechanical phase, justifies our rejecting the Board's said finding of dilatoriness. It cannot be used to sustain the Board's order in this respect, based on § 8(a) (1) and (5) of the Act.

■ 3. When the strike occurred on April 16, 1961, respondent met its obligation to its newspaper readers and advertisers and kept its plant in operation. Deadlines were met and editions were issued. Respondent refused to permit the strike to paralyze its operation. To meet the emergency thrust upon it by the union, the employer acted by contracting out its composing work. It was a result which was forced upon it by the union and we agree with the Trial Examiner that this action, without notifying or consulting with the union, was not a violation of § 8(a) (5) of the Act. We are not convinced by the Board's order or its reasons to the contrary. Moreover, as a result of its experience in contracting out this work, respondent learned that it had found a cheaper way of handling this part of its business, as detailed by the Trial Examiner. Thus respondent continued its changed method of operation, by eliminating the use of certain of its machines.

In reversing the Trial Examiner on this point, the Board relied on its own decision in Hawaii Meat Company, Limited, 139 N.L.R.B. 966, saying that it had " * * * recently held that an employer who permanently subcontracted its delivery service during an *economic strike* without notification to, or bargaining with, the union violated Section 8(a) (5) * * * ". Since the Board's ruling in

this case, the Court of Appeals for the 9th Circuit denied enforcement of the Board's order in Hawaii Meat Company v. N. L. R. B., 9 Cir., 321 F.2d 397. This opinion has become final, since certiorari was not sought.

We are not called upon in this case to decide whether, in a situation where no strike has been called and the bargaining table remains accessible to both parties, the question of contracting out work by an employer is a subject of collective bargaining. Instead, we have a case where the union has turned its back on collective bargaining and has, by calling a strike, placed the employer suddenly in a position made precarious by the inexorable demands of newspaper publication. If publication may be interrupted while bargaining drags on over matters which have to do with what means the publisher may use in getting his paper on the streets and in the mail, the paper may cease to exist. It would be a startling doctrine indeed if this court were to tell companies and employers faced with extinction because of a strike, that before they can make economic business decisions to contract out work in order to continue operations, they must first consult the union that caused the threat of extinction.

Lastly, it is significant that the Board's brief in this court admits that respondent was not motivated by antiunion reasons in acting as it did, and also does not discredit the respondent's claim that it contracted out the work for valid economic reasons.

■ 4. One more point requires our attention. The Board contends that respondent violated § 8(a) (1) and (3) of the Act by refusing to reinstate strikers upon their unconditional application for reinstatement. The Trial Examiner found that respondent made valid offers of reinstatement to 33 former employees. None returned to work. The Board rejected this finding. We believe it erred. We find no discrimination practiced in respondent's offers of reinstatement. N. L. R. B. v. Audio Industries, Inc., 7 Cir., 313 F.2d 858, 861; N. L. R.

B. v. Community Shops, Inc., 7 Cir., 301 F.2d 263, 266; cf. Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855, 858.

On the charged violation of § 8(a) (1) and (3), the order will not be enforced.

For these reasons, we refuse enforcement of the order of the Board and set aside said order.

Enforcement refused and order set aside.