**UNITED SUPERMARKETS, INC., Petitioner Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross–Petitioner.**

No. 88–4027.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1989.

---

**550**

Don Graf, Dan G. Young, McCleskey, Harriger, Brazill & Graf, Lubbock, Tex., for petitioner cross-respondent.

Wm. M. Bernstein, Deputy Assoc. Gen. Counsel, NLRB, Aileen A. Armstrong, Barbara A. Atkin, Washington, D.C., Michael Dunn, Regional Director, NLRB, Edward B. Valverde, Fort Worth, Tex., for NLRB.

Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.

Before WILLIAMS and GARWOOD, Circuit Judges, and POLOZOLA,* District Judge.

JERRE S. WILLIAMS, Circuit Judge:

Appellant United Supermarkets, Inc. ("United") appeals the decision and order of the National Labor Relations Board that affirmed an Administrative Law Judge's conclusion that United unlawfully withdrew recognition from the Retail Clerks Union, Local 368, chartered by United Food & Commercial Workers International Union, AFL–CIO, in violation of § 8(a)(1) and (5) of the Labor Management Relations Act. 29 U.S.C. § 158(a)(1) and (5). After reviewing the record, we find that it contains substantial evidence to affirm the Board's decision and order.

## I. *Facts and Prior Proceedings*

United operates a chain of grocery stores including stores in Amarillo, Texas. In 1977, the Union mounted an organizing campaign in the Amarillo stores and two separate elections were held, one for the employees in the grocery unit and the other for the employees in the meat market unit. The unit involved in this dispute is the meat market unit.

On August 26, 1977, the Union was successful in the meat market unit election despite numerous unfair labor violations by United designed to undermine employee support for the Union. It was not, however, successful in the grocery unit. The Board, in a proceeding that addressed both elections, found over thirty separate violations [1] of Section 8(a)(1) and (3) of the Act.[2]

---

* District Judge of the Middle District of Louisiana, sitting by designation.

1. Among the violations: the Company coercively interrogated employees. It threatened to close some or all of the stores, to reduce employees' hours of work, to lay off employees, and to refuse to bargain in good faith if employees selected the Union as their collective bargaining representative and also threatened to "trump up" charges to get rid of union activists. United also promised employees better wages and benefits if they rejected the union, solicited employees to spy upon and report the union activities of other employees, and created the impression of surveillance of employees' union activities.

The company also violated the Act by discharging two of the employees in the meat market unit and seven of the employees in the grocery unit in retaliation for their union activities.

2. Sections 8(a)(1) and (3) read as follows:
   (a) It shall be an unfair labor practice for any employer–
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; ...
   (3) by discrimination in regard to hire or tenure of employment or condition of employment to encourage or discourage membership in any labor organization....
   29 U.S.C. § 158(a)(1) and (3).

*See United Supermarkets, Inc.,* 261 N.L.R.B. 1291 (1982).

Because of objections filed by United after the election and the unfair labor practice proceedings that developed out of the violations, the Union was not certified as the representative of the meat market employees until May 28, 1982. After certification, the Union requested bargaining in mid-June of 1982. The parties then met for the first time in September of 1982, at which time the Union made its first proposal. United made a counterproposal on October 7, 1982.

Throughout this period, United continued to appeal the Board's decision and remedial order addressing the unfair labor practices that occurred at the time of the 1977 election. Pending the appeal, United refused to comply with the remedial order which required United to offer reinstatement or backpay to all the unlawfully discharged employees and also imposed a number of other remedial procedures.[3]

Five months after the certification, on October 27, 1982, a decertification petition was filed. A wide majority of the employees in the meat market unit had signed it. On March 15, 1983, following this Court's affirmation of the Board's remedial order with respect to the unfair labor practices of United as to both units, 699 F.2d 1161 (5th Cir. 1983), United offered reinstatement to the wrongfully discharged employees. United however refused to offer backpay and is still litigating the amount owed.

Meanwhile, the parties did not meet after the October 7 counterproposal by United, but communicated intermittently by telephone and letter until July 15, 1983, when United advised the Union that it doubted the Union's majority status and would no longer engage in bargaining with the Union. United withdrew recognition from the Union, basing its decision on the decertification petition that was signed by substantially all of the employees, statements it claimed employees made tending to show that the Union had lost majority status, and the inactivity of the Union in pursuing negotiations for a contract.

The Union then filed a complaint against United claiming violation by United of § 8(a)(1) and (5) of the Act[4] when it withdrew recognition of the Union. On June 21, 1984, an ALJ rendered a decision against United and ordered United to cease all interference with employees' rights under the Act, to advise the employees and the Union that the Union was the exclusive collective bargaining representative of the employees employed in the meat market unit, to bargain with the Union upon request, and to post notices to the employees of their rights to a union. Upon appeal by United, the Board affirmed the ALJ's decision and order on December 15, 1987. United now petitions for a reversal of this order.

## II. *Standard of Review*

The Board's findings of fact are conclusive if supported by substantial evidence on the record considered in its entirety. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Reasonable inferences drawn by the Board from its findings of fact may not be displaced even if the court might have reached a different view had the matter been before it *de novo. N.L.R.B. v. United Insurance Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991–92, 19 L.Ed.2d 1083 (1968);

---

**3.** The Board also imposed extraordinary remedies that included the requirement that United mail the required notice to each employee and assemble the employees to read this notice out loud to them. United was required to grant the Union reasonable access to store bulletin boards and access for reasonable periods of time to nonwork areas within its store to speak to the employees. United was instructed to give reasonable notice to the Union of any company speech to any group of employees on the question of union representation with reasonable opportunity to be present, and upon request, time and facilities to address the employees on the question of union representation. *United Supermarkets, Inc.,* 261 N.L.R.B. at 1293–94, 1322.

**4.** Section 8(a)(5) of the Act provides in pertinent part that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(5).

*Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465.

The Supreme Court has stated that "the Board has the 'special function of applying the general provisions of the Act to the complexities of industrial life,' and its special competence in this field is the justification for the deference accorded its determinations." *N.L.R.B. v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (citations omitted).

### III. *Validity of the Withdrawal of Recognition of the Union by United*

■■■ A certified union's majority status is irrebuttably presumed to continue for a reasonable period, normally one year from the date of its certification. *Brooks v. N.L.R.B.*, 348 U.S. 96, 98–99, 75 S.Ct. 176, 178–79, 99 L.Ed. 125 (1954); *N.L.R.B. v. A.W. Thompson, Inc.*, 525 F.2d 870, 871 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976) ("*Thompson II*"). Once the certification year expires, the employer may withdraw recognition lawfully by rebutting the presumption with an affirmative showing 1) that it had a reasonable, objectively-based good faith belief that the union no longer represented a majority of the bargaining unit employees, or 2) that the union in fact no longer represented the majority of the employees. *Thompson II*, 525 F.2d at 871; *N.L.R.B. v. Gulfmont Hotel Co.*, 362 F.2d 588, 589 (5th Cir.1966).

■■ United did not attempt to show by objective evidence such as a head count or poll that the Union had in fact lost the majority support of the employees. Rather, United undertook to justify its withdrawal of recognition of the Union in July on its good faith belief that the Union no longer represented a majority of the employees. United cited three factors that it alleged led it to this conclusion: 1) the decertification petition signed by a majority of the employees in the unit, 2) alleged statements and conduct of employees around the time of the decertification petition indicating a lack of interest in the Union, and 3) an alleged failure of the Union to pursue collective bargaining aggressively.

We agree with the Board's conclusion that each of these factors is an unreliable indicator of employee union sentiment in this case. The conclusion is supported by substantial evidence. The burden is on the employer to prove its good faith belief with "objectively verifiable evidence," and this burden is a heavy one. *N.L.R.B. v. A.W. Thompson*, 651 F.2d 1141, 1143 (5th Cir. 1981) ("*Thompson III*") (the employer must show loss of employee support of the union by "clear and convincing evidence ...". United fails to overcome the burden.

### A. *The Decertification Petition*

Considering the circumstances that existed at the time of the petition, the Board reasonably concluded that United's reliance on the decertification petition was not valid. The evidence of the overall situation, coupled with the evidence that established "a tendency" of the many unfair labor practices of United "to interfere with the free exercise of employee rights under the Act" at the time of the decertification petition, cast sufficient doubt on the reliability of the petition.[5] *The Hearst Corp., San Antonio Light Div.*, 281 N.L.R.B. No. 113, 123 L.R.R.M. (BNA) 1241, 1242–43 (1986), *enforced mem.*, 837 F.2d 1088 (5th Cir.1988). Thus, we find substantial evidence to support the Board's determination.

Employees submitted the petition only five months after the Union was certified. It is settled that a decertification petition generally does not warrant suspension of the rule that the majority status of a union cannot be challenged for a year following certification. *Brooks*, 348 U.S. at 97–102, 75 S.Ct. at 178–80. Only a very narrow class of exceptions to the inviolability of

---

**5.** United argues direct evidence is required to show that the unlawful conduct actually tainted the employee's signatures on the decertification petition. It is well-settled, however, that the actual effect of the coercive conduct is irrelevant. *See N.L.R.B. v. Kaiser Agr. Chem. Div. of Kaiser A & C Corp.*, 473 F.2d 374, 383 (5th Cir.1973).

the certification year are recognized. None of them were present here. *See Guerdon Industries, Inc.*, 218 N.L.R.B. 658, 659 (1975).

Bargaining for an initial contract had just begun in this case. Indeed, United had just given the Union its counterproposal only three weeks earlier. Employees, however, had been waiting since August of 1977, the date of the election of the Union, for results they had yet to see. An impatience and lack of support for the Union on the part of the employees was understandable. Thus, to give weight to this decertification petition would defeat the policy behind the special status given a union during the certification year. A union needs to be given a reasonable time to prove its worth to the employees without added pressure from the employer. See *Brooks*, 348 U.S. at 100, 75 S.Ct. at 179.

The result would still be the same even if we were to discount the impact of the well-established certification year principle. The petition was signed five months before United began compliance with the remedial order for the pre-election unfair labor violations. It had yet to reinstate several of the employees. This failure to reinstate the employees over a period of five years foreseeably created an atmosphere that discouraged union membership and deterred organizational activity and respect for the organization among the remaining employees. Moreover, the delayed reinstatement deprived the Union of some of its strongest supporters during the most difficult period for a union, before it could successfully negotiate its first contract. See *Doug Hartley, Inc.*, 255 N.L.R.B. 800, 801 (1981) (unlawful discharge goes "to the very heart of the Act" and has "lingering effects"); *Olson Bodies, Inc.*, 206 N.L.R.B.

779, 779–80 (1973) (unlawful discharges have "lasting impact").

The other pre–1977 violations discounted as well the reliability of the petition because of their continued effects on the employees. Considering the egregiousness of the violations, it was reasonable to conclude that they had had a negative impact upon the employees who participated in the decertification petition. See *Chicago Magnesium Castings Co.*, 256 N.L.R.B. 668, 674–75 (1981). The Board had substantial evidence to support its determination that the decertification petition was an unreliable indicator of employee sentiment even if it were free from unfair labor practices.

We do not hold that unremedied unfair labor practices prevent a company from ever asserting a good faith doubt of the Union's majority status. There must be a reasonable likelihood the unfair labor practices have a continuing impact upon the employees to bar an employer from challenging a union majority.[6] In this case there is substantial evidence, viewing the circumstances as of October 27, 1982,[7] the date of the decertification petition, from which an inference was properly made that the unfair practices likely contributed to the loss of majority status exhibited by the petition. See *N.L.R.B. v. Randle–Eastern Ambulance Service, Inc.*, 584 F.2d 720, 730 (5th Cir.1978). Thus, even after the certification year, a decertification petition filed by employees is not strong proof of loss of majority if the petition is filed while the influence of employer unfair labor practices still persists. The reliability of the petition as to actual employee sentiment, therefore, is exceedingly doubtful. United should be prevented from relying upon it because the majority loss, as evidenced by

---

6. It is well-settled that a good faith doubt of majority status can arise only in a context free of the coercive effect of employer unfair labor practices. *Medo Photo Supply Corp. v. N.L.R.B.*, 321 U.S. 678, 687, 64 S.Ct. 830, 835, 88 L.Ed. 1007 (1944); *N.L.R.B. v. A.W. Thompson*, 449 F.2d 1333, 1336 (5th Cir.1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972) ("Thompson I"). Thus, an employer cannot lawfully withdraw recognition from a union if it has committed as yet unremedied unfair labor practices that could have reasonably tended to

contribute to employee disaffection from the union. *Chicago Magnesium Castings Co.*, 256 N.L.R.B. at 674.

7. United argues that the crucial date is in July of 1983 when it actually withdrew support. However, the focus is on the validity of the petition because that is the major factor that United chose to rely upon when it withdrew support.

the petition, was attributable to United's own unlawful conduct. *Chicago Magnesium Co.*, 256 N.L.R.B. at 674.

### B. *Lack of Employee Interest in the Union*

According to United, it learned on October 27, 1982, that a union representative had tried to hold a meeting with the employees but that the employees failed to attend. United also claimed that some of the employees on that same day told a union representative that they were not interested in joining the Union. The Board reasonably concluded that these statements did not constitute objective evidence that could properly be relied on to form a good faith belief as to the validity of the Union.

First, it is well settled that " 'speculative and subjective' evidence, dependent upon 'isolated reports' from 'vague and unidentified sources' " cannot be the basis of a good faith belief of a union's loss of majority. *Randle–Eastern Ambulance Service, Inc.*, 584 F.2d at 729. The evidence relied on by United consisted of uncorroborated testimony by United's attorney. The record lacks the total number of and the names of the employees who supposedly made these statements. This evidence is not sufficient to raise a good faith doubt as to the validity of the Union.

Also, the statements were made on the same day the decertification petition was filed. Thus, they lack reliability for the same reasons the decertification petition does. The Board was correct in finding these statements unreliable.

### C. *The Claimed Lack of Negotiation By the Union*

United's final premise for withdrawing recognition of the Union is the failure of the Union to respond to United's counterproposal of October 7, 1982, until February 10, 1983. United's conclusion, however, was unwarranted in light of the aggressive negotiation that began in February and continued until United withdrew recognition in July. A bargaining session was held on March 9 at the Union's request, and after that, the Union made several at-tempts to set up another meeting, but United continued to delay until July. In these circumstances, the Board found the earlier delay in bargaining by the Union to be an unreliable factor in the determination of the Union's support among the employees of the meat market unit. This result is particularly appropriate since the Union had only begun to reorganize as of October after the long hiatus caused by United's unfair labor practices. The delay in negotiation was clearly understandable. We thus agree with the Board's determination that the lack of negotiation was an unreliable factor.

### IV. *The Remedial Order*

United argues that the remedial order of the Board is too broad and is made without regard to the actual state of the Union's majority status. United argues that the Board inappropriately reinstated the Union without looking to the actual employee support for the Union. This contention is without merit because the Union remains certified until United overcomes the presumption of majority status.

Further, the requirement that United bargain with the Union and inform the employees of their rights of organization and collective bargaining is justified regardless of actual majority support. Where, as is the situation here, the unfair labor practices were found to have had the tendency to undermine the majority status of the certified union, an order to bargain is an appropriate remedy. *Chromalloy Mining and Minerals Alaska Div. v. N.L.R.B.*, 620 F.2d 1120, 1129 (5th Cir.1980) (even though the union actually lost the election, a bargaining order was appropriate because the unfair labor practices caused the loss of the election).

### V. *Conclusion*

We hold that there is substantial evidence in the record considered as a whole to uphold the Board's determination that when United withdrew recognition from and refused to bargain with the Union, it lacked the foundation for a good faith belief that the Union no longer represented a

majority of the workers. We affirm the Board's decision that United violated Section 8(a)(5) and (1) of the Act and that United must comply with the remedial order requiring United to "reinstate" its recognition of the Union as the collective bargaining agent for the meat department, together with appropriate notices.

AFFIRMED.