**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**POWELL ELECTRICAL MFG. CO., and Process Systems, Inc. of Houston, Respondent.**

**No. 89–4065.**

United States Court of Appeals, Fifth Circuit.

June 28, 1990.

William A. Baudler, Aileen A. Armstrong, Deputy Assoc. Gen. Counsel, N.L.R.B., Collis Suzanne Stocking, Washington, D.C., Michael Dunn, Dir., N.L.R.B. Region 16, Fort Worth, Tex., for petitioner.

J. Wray, A.J. Harper, II, Fulbright & Jaworski, Houston, Tex., for respondent.

Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Powell Electrical Manufacturing Company and Process Systems Inc. of Houston, both subsidiaries of Powell Industries, appeal a National Labor Relations Board's order to reinstate and make whole certain striking workers. Agreeing with the Board that the strike became an unfair labor practice strike when Powell without justification declared that negotiations had reached an impasse, we enforce the order of reinstatement but modify the procedure for establishing reinstatement rights for particular employees.

## I.

This appeal involves a dispute about the events that transpired in attempts by Powell and its employees' union to negotiate a new contract. Employees of both subsidiaries are included in a single bargaining unit, represented by the International Brotherhood of Electrical Workers, Local Union No. 716, AFL–CIO. Powell and IBEW have been negotiating collective bargaining agreements for thirty years. The contract leading to this proceeding expired in early August 1985.

Shortly before the expiration of the agreement, Powell and the union began negotiating a new contract. On August 22, after five negotiation meetings, at least one with a federal mediator, the union called an economic strike to put pressure on the company to speed the pace of negotiations. The sixth negotiation meeting was scheduled for and occurred on the day the union called the strike. At that meeting the parties engaged in caucuses, the union offered a counterproposal, and the company rejected the counterproposal. As the meeting ended, the company attorney stated that he believed the union's proposals were too expensive and unworkable. He then stated the issues on which he believed the parties were still far from agreement. Further, he went on to say that it was unfortunate that the union had "gone to war," and he declared that in his opinion the parties had reached an impasse. The company then began to implement the provisions of the last offer it made before declaring the impasse. It also began to replace the striking workers.

The next day, union members met with the union attorney. He told them that in his opinion the company had implemented the provisions of its last offer before reaching an impasse and had converted the strike to an unfair labor practice strike. He asked the members if they wanted to continue the strike as an unfair labor practice strike, and the members present voted unanimously to do so. The strikers modified their picket signs to reflect that the strike was directed against company unfair practices.

At the union's request, the federal mediator arranged another bargaining meeting for September 4. On the day of the meeting, an employee gave the company's presi-

dent a petition, purportedly signed by around 52 percent of the total workforce, stating that the employees no longer wanted to be represented by the union. When the meeting began, the company's attorney told the union that the company had a good faith doubt that the union continued to represent a majority of the employees and it would therefore cease recognizing and bargaining with the union.

On October 17, 1985, nearly two months after the beginning of the strike, the union contacted the company officials on behalf of all striking employees and unconditionally offered to return to work. The company did not reply.

The union then petitioned the National Labor Relations Board, asserting unfair labor practice claims against the company under the Labor Management Relations Act. An administrative law judge found that Powell had engaged in unfair labor practices in violation of 29 U.S.C. § 158(a)(1) and (a)(5) by unilaterally implementing new terms and conditions of employment and by withdrawing recognition from and refusing to bargain with the union. He further found that Powell had violated 29 U.S.C. § 158(a)(1) and (a)(3) by failing to reinstate unfair labor practice strikers who unconditionally requested reinstatement. The ALJ recommended that the NLRB order the company to cease and desist from the unfair labor practices and from interfering with, restraining, or coercing employees in the exercise of rights guaranteed by the Act. Further, the recommended order required the company to bargain with the union, to reinstate any unilaterally altered term or condition of employment upon the union's request, and to offer reinstatement to and make whole the strikers that the company failed to reinstate as of October 17, 1985. The proposed order also required Powell to make the unit employees whole for any losses they might have suffered as a result of the unlawful unilateral changes in wages and working conditions and to post appropriate notices.

The Board adopted the ALJ's recommended order. Powell appeals, arguing that (1) negotiations had reached an impasse; (2) impasse or not, economic necessity entitled the company to implement its changes unilaterally in response to the union's economic strike; (3) it properly withdrew its recognition from the union in good-faith reliance on the decertification petition; and (4) the reinstatement portion of the Board's order violated the company's due process rights by requiring the reinstatement of individuals who were not discriminatees. We consider each of these arguments in turn.

II.

Powell's first and most important challenge to the Board's decision involves the impasse issue. Powell maintains that its attorney properly declared that an impasse in negotiations had occurred. Accordingly, it argues, the company was privileged to implement unilaterally new terms of employment. *See Laborers Health & Welfare Trust v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n. 5, 108 S.Ct. 830, 833 n. 5, 98 L.Ed.2d 936 (1988); *Taft Broadcasting Co.*, 163 N.L.R.B. 475, 478 (1967), *review denied sub nom. American Fed. of Television & Radio Artists v. N.L.R.B.*, 395 F.2d 622 (D.C.Cir.1968). We find sufficient evidence in the record to support the Board's determination that no impasse was reached and we do not disturb this holding of the Board.

A decision about whether negotiations have reached an impasse is particularly suited to the Board's expertise as fact finder. *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982). As a result, we review the Board's decision as we review fact findings, determining whether there is substantial evidence to sustain the Board's conclusion. *See Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1317 (5th Cir.1988).

For an impasse in negotiations to exist, further discussion must be futile as of that time in view of all the circumstances of the bargaining. *Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390, 1398 (5th Cir.1983). An impasse requires a deadlock, and for such a deadlock to occur, *"neither*

*party* must be willing to compromise." *Huck*, 693 F.2d at 1186 (emphasis in original).

 Powell argues that the evidence fails to support the Board's determination that there was no impasse. We disagree, finding the record replete with indications that future bargaining would not have been futile.[1] To begin with, little substantive bargaining had taken place before the time of the purported impasse. The parties only had met five times and most of those sessions had revolved around disputes about whose proposals would serve as a basis for negotiations. The existence of so few substantive sessions cannot alone lead to the conclusion that there was no impasse. But it certainly constitutes an important factor to be weighed in evaluating the Board's decision.[2] Even to the extent that bargaining took place in those first five meetings, however, the record indicates that the parties already had agreed on some language. We also note that a federal mediator was present for the session immediately preceeding the session where the company declared an impasse, which "reinforces the inference that the negotiations were continuing at that time." *Huck*, 693 F.2d at 1186.

Moving beyond the number of bargaining meetings, the evidence strongly suggests that negotiations were far from futile on the very day the company declared an impasse. After returning from the caucus that afternoon, the union presented six counter-proposals. The Company only responded to one, which essentially had been agreed upon earlier. Rather than offering any of his own proposals, the company's lawyer announced that the union's counter-proposals were too costly and unworkable and then listed all the issues on which he believed the parties were still far apart. Although his list included many items on which the parties had not neared agreement, the union had not refused—as the company would have us believe—to negotiate about many of those matters.[3] Indeed,

---

1. The company urges us to define impasse more broadly than we have in *Gulf States* and other cases. Following its reading of the Board's decision in *Hi–Way Billboards, Inc.*, 206 N.L.R.B. 22 (1973), *enforcement denied*, 500 F.2d 181 (5th Cir.1974), the company maintains that "[a genuine impasse] is merely a momentary eddy in the flow of collective bargaining." *Hi–Way Billboards*, 206 N.L.R.B. at 23. Powell argues that the Supreme Court adopted this definition in *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982). There the Court explained that "[a]s a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.'" *Bonanno Linen*, 454 U.S. at 412, 102 S.Ct. at 725 (quoting *Bonanno Linen*, 243 N.L.R.B. 1093, 1093–94 (1979)). Under this definition, Powell maintains, its attorney properly declared the existence of an impasse.

Such a broad definition of "impasse" is not the law governing this case. While Powell urges this Court to follow the *Hi–Way Billboards* and *Bonanno Linen* definition, it fails to recognize the particular context of those cases. Both cases involved a determination about whether a "genuine impasse" constituted sufficient grounds to warrant an employer's withdrawal from a multi-employer bargaining unit. Once negotiation has begun, such withdrawal is only permitted upon "mutual consent" or "unusual circumstances." *See Hi–Way Billboards*, 206 N.L.R.B. at 22 (explaining *Retail Associates*, 120 N.L.R.B. 388, 393–95 (1958)). In both cases, the Board determined that an impasse did not meet the "unusual circumstances" requirement.

2. Although the Board does not consider the number of bargaining sessions to be controlling, as a general rule it considers that the more meetings the parties have held, the better the likelihood of finding an impasse. *See Richmond Recording Corp. d/b/a PRC Recording Co.*, 280 N.L.R.B. 615, 635 (1986), *enforced*, 836 F.2d 289 (7th Cir.1987); *see also Laborers Health & Welfare Trust*, 108 S.Ct. at 833 n. 6 (explaining that "impasse" is not a precise term of art and that, among other things, the Board and Courts look at the number of meetings between the company and the union). In *Huck*, there also had been only six negotiation sessions prior to the employer's declaration of impasse. Apparently only four of those consisted of more than mere recitation of contract terms. *See Huck*, 693 F.2d at 1186–87. The ALJ gave weight to the limited number of meetings, and we upheld the decision on that fact as well as others.

3. Powell places much stock in statements made by the union's attorney during the fourth and fifth sessions when asked by the company's lawyer to state his position on a number of proposals. The union attorney responded that, if the proposals were not directly addressed in coun-

included in the six counter-proposals the union offered during the sixth session were proposals involving sub-contracting, check-off of union dues, the number of total work hours, supervisors' authority, accident reporting, and management's right to change work methods and output requirements. These proposals obviously were grist for the collective bargaining mill.

In examining whether negotiations had truly reached an impasse during that final meeting, we cannot ignore one crucial event. While the union was caucusing to prepare its counter-proposals, the company's negotiators conferred by telephone with company officials. Those officials informed the negotiators that the strike was only supported by 40 to 45 percent of the employees. During that same conversation, officials and negotiators discussed the possibility of unilaterally implementing the company's earlier proposals. Hence, even before the company had received the union's counter-proposals, it may have decided already to declare an impasse. We find no error in the ALJ's finding that Powell "seiz[ed] the opportunity of apparent Union weakness to declare that the bargaining was at an end and that it would go its own way."

Because substantial evidence on the record indicates that the parties were not at a deadlock and that future attempts at bargaining would not clearly have been futile, we find no error in the Board's conclusion that negotiations were not at an impasse.

### III.

 The company argues that even in the absence of impasse it was privileged to implement its changes because of its own situation. As a general rule, where no

impasse in negotiations has occurred, a company's unilateral implementation of terms and conditions of employment is an unfair labor practice. *See NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Huck,* 693 F.2d at 1186.[4] Just as the calling or exercise of a strike does not in itself mean negotiations have reached an impasse, a strike does not terminate an employer's duty to bargain. *NLRB v. J.H. Rutter–Rex Mfg. Co.,* 245 F.2d 594, 596 (5th Cir.1957); *Capital–Husting Co.,* 252 N.L.R.B. 43, 45 (1980), *enforced,* 671 F.2d 237 (7th Cir.1982). The union's calling of a permissible economic strike to add pressure in the bargaining process was a core exercise of protected bargaining activity. It did not empower the company to impose its proposals.

 The company argues that its situation falls within a recognized exception to the general rule against unilateral implementation of proposals because it was forced to take unilateral steps due to business necessity. It relies on several cases where this Court and other Courts have held that unilateral actions by employers in the midst of a strike, taken because of business necessity, did not constitute violations of the Act. *See, e.g., Neon Sign Corp. v. NLRB,* 602 F.2d 1203 (5th Cir. 1979); *NLRB v. Robert S. Abbott Publishing Co.,* 331 F.2d 209 (7th Cir.1964); *Hawaii Meat Co. v. NLRB,* 321 F.2d 397 (9th Cir.1963). Powell's evidence does not demonstrate that either the actions it took or the circumstances surrounding those actions are sufficient to bring it under the narrow business necessity exception.

First, Powell offers little evidence in support of its proposition that business necessity dictated its actions. Indeed, the only

---

ter-proposals, they were rejected. The company ignores, though, that several important issues were included in the union's proposals and counter-proposals, at earlier meetings as well as the final one.

4. The impasse exception to the general rule was claimed by the appellant and we consider that claim. We also consider appellant's claim that the "business necessity" exception to the general rule was applicable in this case. Appellant did

not rely upon a third exception to the general rule which allows a unilateral change in working conditions during a strike and before impasse if the employer notifies the union that it intends to institute the change and gives the union the opportunity to respond to that notice. *NLRB v. Tex–Tan, Inc.,* 318 F.2d 472, 481 (5th Cir.1963); *NLRB v. Citizens Hotel Co.,* 326 F.2d 501, 505 (5th Cir.1964). *See also, Huck,* 693 F.2d at 1186, n. 15. Appellant had not complied with the notice requirement to invoke that rule.

evidence the company cites is testimony by one of its negotiators that the management decided during the August 22 meeting to "put in whatever is necessary so that we can keep the company running" and to establish terms and conditions of employment in the absence of a contract. The testimony regarding this purported necessity, by the company's own account, comprises only three pages of the transcript of the proceedings before the ALJ. Even assuming the veracity of the testimony, the ALJ rightly found that the company's claim of business necessity represented nothing more than its position in the bargaining. During the bargaining it maintained that economic conditions required changes in terms and conditions of employment. No extraordinary condition was shown that would permit the company to take unilateral action.

■ Second, even the exception Powell claims would not shield its actions in this case. The purpose of the business necessity exception is to allow companies, in very limited situations, to make unilateral changes that will enable them to continue operating in an emergency situation caused by a strike. *See American Cyanamid Co. v. NLRB*, 592 F.2d 356, 360–61 (7th Cir. 1979) (discussing *Abbott, supra* and *Hawaii Meat Co., supra*). Contrary to the company's contention, then, an employer may not unilaterally and permanently impose contract changes as a means of dealing with difficulties prompted by the strike. *Id.*[5]

In this case, the record reveals that the company intended its changes to apply for the foreseeable future. Soon after the company declared an impasse, its counsel sent a letter to union representatives specifying that all future negotiations would be conducted with the company's terms in place and that the wage and cost-of-living freeze that the company had implemented would continue for at least one year. The actions taken by the company in the present case, therefore, do not justify a

deviation from the general rule that a company's unilateral implementation of terms and conditions of employment is an unfair labor practice.

## IV.

Next Powell argues that it properly withdrew its recognition of the union when faced with the decertification petition. That petition, the company avers, resulted in a good faith belief that the union no longer represented a majority of the employees. Because we find substantial evidence to support the Board's determination that the company's unfair labor practices tainted the legitimacy of the petition, we uphold the Board's decision that the company could not properly base its withdrawal on the petition.

■ A union selected in a Board-conducted election is entitled to a continuing presumption of majority status. *See Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). To rebut the presumption and withdraw recognition of a union lawfully, an employer must affirmatively show (1) that it had a good-faith belief, founded on a sufficient objective basis, that the union no longer represented a majority of the employees; or (2) that the union in fact did not enjoy majority support. *NLRB v. Curtin Matheson Scientific, Inc.,* —— U.S. ——, 110 S.Ct. 1542, 1545, 108 L.Ed.2d 801 (1990); *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549 (5th Cir.1989). The employer must demonstrate its belief by clear and convincing evidence. *NLRB v. A.W. Thompson, Inc.,* 651 F.2d 1141, 1143 (5th Cir.1981).

■ It is well settled that a good-faith doubt as to the union's continuing majority status can arise only in a context free of the coercive effect of unfair labor practices. *United Supermarkets*, 862 F.2d at 553 n. 6. Consequently, "an employer cannot lawfully withdraw recognition from a union if it has committed as yet unreme-

---

5. The company also places much reliance on our decision in *Neon Sign Corp., supra.* But in *Neon Sign,* the company made a strong assertion that a decrease in wages was essential to its

survival. Further, the Court determined that, for all intents and purposes, bargaining had ended when the strike began. There was an impasse.

died unfair labor practices that reasonably tended to contribute to employee disaffection from the union." *Id.* at 554; *accord NLRB v. A.W. Thompson, Inc.,* 449 F.2d 1333, 1336 (5th Cir.1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972).

Given the circumstances surrounding the decertification petition in the instant case, we find no error with the Board's conclusion that the petition was tainted by Powell's unfair labor practices. Not only is the evidence substantial to support that conclusion, but Powell offers no evidence to support its claim to the contrary. Powell merely argues that there is no basis for concluding that its unilateral actions would have had any negative effect on the employees' view of the union. If anything, it maintains, some of the changes made by the company would have caused dissatisfaction with the company, not the union. None of these assertions successfully rebuts the Board's conclusion.

Both the company's unilateral implementation of its policies and its refusal to bargain collectively reasonably could have contributed to employee disaffection with the union.[6] At the inception of a valid economic strike, the company unilaterally imposed some changes that placed the employees in a worse position than they were in before the strike.[7] It is not at all unreasonable to conclude that some employees blamed the

union for their problems.[8] Combined with the company's declaration that it would no longer bargain with the union, the employees easily could have begun to see their representatives as ineffectual. As the Supreme Court recognized years ago, an employer's unlawful refusal to bargain collectively with its employees' chosen representatives "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944). Accordingly, we hold that the Board properly determined that the petition was tainted by the company's unlawful actions.

Powell also maintains that, even before it declared impasse, it had a good faith belief that the union did not represent a majority of the employees. The only evidence it offers of employee dissatisfaction with the union is the refusal of a majority of the employees to join in the strike. The Board and Courts have long held, however, that an employee's failure to join a strike cannot give rise to any presumption that he or she no longer supports the union. *Retail, Wholesale & Dept. Store Union v. NLRB,* 466 F.2d 380, 394 (D.C.Cir.1972). *See, e.g., Bickerstaff Clay Products Co. v. NLRB,* 871 F.2d 980, 988 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989);

**6.** Powell argues that its actions could not have caused *all* the persons who signed the decertification petition to do so. This argument, however, does not address the proper issue. The question is simply whether its actions could have *contributed to* employee disaffection. *See United Supermarkets, supra.* Since only fifty-two percent of the employees signed the petition, at least a few of those who did so might have been induced by practically any unlawful action by the company.

**7.** In addition to a wage and cost of living freeze, the company implemented proposals dealing with management rights; employee freedom and security; promotions, filling of vacancies, and lay-offs; hours of employment and overtime; work rules and employee attendance; merit wage increases; shift differentials; report and call-in or call-back pay; jury service; funeral leave; supervision; safety; physical examination and company right to search; approved leave of absence; military service; holidays; va-

cations; sick leave; benefit plans; grievance and arbitration procedure; job classifications and hourly wage rates; and general work rules and regulations.

The company's argument rests on the contention that the changes either did not affect or negatively affected the status of employees. Had the changes immediately improved the terms and conditions of employment, it would be clear that the changes tainted the decertification petition since employees might reasonably have tended to think they were better off without the union.

**8.** So obvious are the dangers of employee dissatisfaction with a union due to an employer's unilateral implementation of a wage and benefit package that the Ninth Circuit has declared that "an employer may not use the filing of a decertification petition in the context of unfair labor practices as a defense to a refusal to bargain charge." *NLRB v. Auto Fast Freight, Inc.,* 793 F.2d 1126, 1130 (9th Cir.1986).

*NLRB v. Windham Community Memorial Hospital,* 577 F.2d 805, 813–14 (2nd Cir. 1978); *NLRB v. Frick Co.,* 423 F.2d 1327, 1333–34 & n. 12 (3rd Cir.1970); *James Whitfield d/b/a Cutten Supermarkets,* 220 N.L.R.B. 507, 509 (1975). *Cf. Curtin Matheson, supra* (upholding Board's refusal to adopt a presumption that striker replacements oppose the union). In the present case, then, the company did not meet its burden of proving by clear and convincing evidence either that the majority of the employees no longer supported the union or that the company had a good faith belief that the union lacked majority support.

## V.

Finally, Powell challenges the Board's order requiring the reinstatement of 62 strikers. In fashioning its order, the Board employed a two-stage approach. The first stage had determined that the company engaged in unfair labor conduct and ordered reinstatement with back pay or other appropriate relief. It also ordered that the specifics of that relief be defined and implemented in the second stage, the compliance hearing. The Board has commonly used this two-tiered approach, which has been approved by the Supreme Court. *See Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 902, 104 S.Ct. 2803, 2814, 81 L.Ed.2d 732 (1984).

 The company challenges the approach in this case, however, arguing that the Board violated the company's due process rights by refusing to consider its claim that certain of the employees were not discriminated against by the unfair labor practices. Specifically, the company contends that it established that 28 of the employees were permanently replaced before the strike became an unfair labor practice strike and are therefore not entitled to immediate reinstatement or to back pay.[9] Moreover, it claims that four of the listed

employees never struck and that, before the hearing took place, nineteen of the workers had been recalled, five resigned, and one died. Since the company established these facts before the order was issued, it argues, the Board violated the company's due process rights by nevertheless ordering reinstatement of all the strikers. The Board's order does appear to presume that each listed employee is entitled to reinstatement and then require the employer to violate the order if it challenges a reinstatement. The Board denied a motion to revise the order but assured the company in the denial opinion that it would not treat the company as a violator in its challenges. But the order needs more precise clarification.

The original order proposed by the ALJ required the reinstatement of all persons listed in the complaint and order. In a footnote in its decision and order, however, the Board explained that it was leaving to the compliance stage "a final determination of those discriminatees entitled to the relief granted in the Order." The Board contends that this "modification" made the list of names no longer binding since the company was entitled to challenge the remedy as to each employee at the compliance stage. But in its motion for reconsideration, the company complained of its fear of being subjected to contempt proceedings for not reinstating those employees whose right to reinstatement it contested. In denying the motion, the Board further detailed the meaning of the order, again in a footnote. The Board stated that the company was only required to make reinstatement offers to "all replaced *unfair labor practice* strikers." It also assured the company that, under the two-stage procedure, the company would not be subject to contempt for not reinstating employees whose entitlement it properly litigated during the compliance stage.

The assurances still left the company in a somewhat precarious position since the

---

**9.** Employees who walk out during an economic strike, as opposed to an unfair labor practice strike, are not entitled to immediate reinstatement if permanent replacements have been hired. Instead, they are entitled to reinstate-

ment only as job vacancies occur. *See NLRB v. MacKay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938).

Board initially ordered reinstatement of all listed employees and then later, with less formality, undertook to assure the company that it would not be held in contempt for refusing to comply with part of the order, assuming the company properly litigated issues relating to its refusal. In the interest of precision, we direct the Board to modify the order to require reinstatement and benefits for strikers listed in the order, except those whose entitlement to reinstatement or to back pay or other benefits the company challenges in good faith. The modified order should also state expressly that as to all listed strikers whose entitlement to reinstatement is challenged, the issue of the named striker's reinstatement, back pay or other possible relief will be litigated and determined at the compliance stage of these proceedings. With this modification the order itself will make clear that the company will not be forced to disobey the order if it refuses before challenge to reinstate those employees it intends to challenge in good faith. The Board should also modify the notice it requires the employer to issue so that such notice will accord with its modified order. The Board's order is ENFORCED as MODIFIED.